IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED
OCT 30 2015
CLERK, US DISTRICT COURT
NORFOLK, VA

307 CAMPOSTELLA, LLC,

        Plaintiff,

  v.                                        Civil Action No. 2:15cv224

TIMOTHY J. MULLANE,
SIX M, LLC,
AMERICAN MARINE GROUP, INC.,
AMERICAN MARINE GROUP, LLC,
DOMINION MARINE GROUP, LTD.,
MULLANE BROS MARINE TRANSPORTATION, LLC,

        Defendants.

## OPINION & ORDER

This matter is before the Court pursuant to a Motion to Dismiss ("Motion") filed by Defendants Timothy J. Mullane,[1] American Marine Group, Inc., American Marine Group, LLC, Dominion Marine Group, Ltd., and Mullane Bros Marine Transportation, LLC ("Defendants"), Doc. 12.[2] For the reasons stated herein, the Court, ruling from the bench, **DENIED** the Motion as to Counts IV–VII and as to the first part of Count III, which alleges claims under 42 U.S.C. § 6972(a)(1)(A). The Court **GRANTED** the Motion **WITH LEAVE TO AMEND** the Complaint as to Count VIII and as to the claims under 42 U.S.C. § 6972(a)(1)(B) in Count III.

### I. BACKGROUND

#### A. Factual Allegations[3]

---

[1] According to Defendants' Motion, Defendant Mullane's correct name is "Timothy S. Mullane." Doc. 13.
[2] Defendant Six M did not join this Motion to Dismiss. Instead, it submitted its Answer on 7/6/15.
[3] "In considering a motion to dismiss, [the Court] accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993)). The Court cautions, however, that the facts alleged by Plaintiff are recited here for the limited purpose of deciding the instant Motion to Dismiss. The recited facts are not factual findings upon which the parties may rely for any other issue in this proceeding.

1

This action arises out of Defendants' alleged introduction of "unseaworthy vessels" and an "unlicensed pier/storage facility" to the Elizabeth River, which creates overcrowded conditions, interferes with and obstructs navigation in the navigable waterway adjacent to Plaintiff's property, causes pollution, and creates blight. Compl. ¶¶ 1, 15, 16. Plaintiff contacted Defendant Mullane in 2013 and 2014, asking him to reduce the number of vessels in the river and to clean up the river; however, Mullane refused. Compl. ¶¶ 2, 3, 4. Plaintiff has brought this action asking the Court to stop Defendants' uncontrolled release of pollution into the river and to remove Defendants' obstructions in the river. Compl. ¶¶ 1, 4.

Plaintiff owns a 6.8 acre parcel of waterfront land, and "[t]he part of the river fronting the [P]laintiff's property is a one quarter mile long waterway in the shape of a 'cul-de-sac' oriented north and south, with the mouth of the 'cul-de-sac' at the north end where it joins the Eastern Branch of the Elizabeth River." Compl. ¶ 7. "The navigable waterway adjoining the [P]laintiff's property belongs to the public." Compl. ¶ 87.

Plaintiff alleges that Defendant Mullane, acting on his own or through others, including, but not limited to the other Defendants, "has overcrowded the waterway with unseaworthy hulks of former vessels, many 60-70 years old, many of them sitting idly for years, many of them aground for years, rusting and having little or no use." Compl. ¶ 11. According to Plaintiff, Defendant Mullane owns and controls the entities that are the Co-Defendants. Compl. ¶ 6. Plaintiff avers that Defendants "berth an unreasonably large number of vessels at an unlicensed pier/storage facility, on the west side of the waterway, approximately 200' from (and immediately in front of) [P]laintiff's property." Compl. ¶ 13. Defendants have not obtained permits for the facility from the Army Corps of Engineers or from the Virginia Marine Resources Commission. Compl. ¶ 13. Plaintiff describes this facility as a two hundred by fifty

foot structure, formerly a Hopper Barge, but no longer a vessel, and it notes that the structure "is pushed up into wetlands on shoreline owned by City of Norfolk." Compl. ¶ 14.

Plaintiff contends that Defendant Mullane previously had been found guilty or liable for violations relating to his activities at this location, including

> a civil penalty and restoration order imposed by the Norfolk Wetlands Board in 2007 for destruction of wetlands; a criminal conviction in the Norfolk General District Court in 2010 for release of hazardous substances into the Elizabeth River; a criminal conviction in the Norfolk General District Court in 2010 for unlawful accumulation of solid waste; a criminal conviction in the Norfolk General District Court in 2010 for failure to notify fire official of release of hazardous waste; a civil penalty imposed by the State Water Control Board in 2010 for release of diesel fuel into the Elizabeth River from a vessel; a civil penalty and restoration order imposed by the Norfolk Wetlands Board in 2012 for destruction of wetlands; and, a civil penalty imposed by the State Water Control Board in 2014 for discharging industrial stormwater into the Elizabeth River without a permit.

Compl. ¶ 3–4.

Plaintiff claims that Defendants' actions have "created an impenetrable barrier around [the unlicensed pier/storage] facility" and that the facility has "been continuously in place for several years." Compl. ¶ 25. The vessels berthed at the unlicensed pier/storage facility "obstruct more than half the channel at all times" in front of Plaintiff's property. Compl. ¶ 30. They also "occupy at least 64% of the channel directly in front of the plaintiff's bulkhead at all times." Compl. ¶ 35. Plaintiff notes that Defendants' "vessels and those of its business invitees[] occupy 50% or more of the channel at the [P]laintiff's non-bulkhead property at all times. They occupy so much of the navigable channel, and their occupation is of such duration, as to impede and/or interfere with the navigation of other vessels in the waterway." Compl. ¶ 41.

According to Plaintiff, "there is an extremely large inner cavity in the [D]efendants' unlicensed pier/storage facility – approximately 4,000 cubic yards – that is filled with hundreds of discarded creosote soaked timbers, discarded mechanical and electrical equipment, discarded

paint cans, discarded drums, trash, rubbish, and other nonputrescible wastes." Compl. ¶ 44. Plaintiff alleges that the exposure to the elements "is causing the wastes in the unlicensed pier/storage facility to deteriorate such that pollution and contamination is carried away by wind, rain, and other forces of nature after which the pollution and contamination is released into the waterway, and hence into the Elizabeth River and the surrounding environment." Compl. ¶ 46. Additionally, "there are large holes in the outer wall of the facility through which . . . contaminated rainwater and contaminated leachate escape into the Elizabeth River." Compl. ¶ 47. Indeed, "there have been at least 180 dates in the last 5 years when a storm event at this location generated rainwater runoff from the many tons of solid waste in Defendants' unlicensed solid waste management facility." Compl. ¶ 49.

Defendants' unlicensed pier/storage facility is "aground, partly in tidal wetlands, and partly in navigable waters," and their other vessels are "aground in nearly all tidal conditions, except for high tide." Compl. ¶¶ 55, 61, 68. Plaintiff alleges that these vessels change the bottom elevation of the waterway. Compl. ¶¶ 56, 62, 69. Additionally, the fact that the vessels are aground creates an "adverse impact to benthic organisms and other aquatic life." Compl. ¶ 71. The vessels' presence in the waterway also causes "a degradation to the physical, chemical and/or biological properties of the waters of the inlet." Compl. ¶ 71.

Rainwater flows off of the vessels and "discharges pollutants into the waterway adjacent to [P]laintiff's property." Compl. ¶ 76. "Water that enters the interior of these vessels collects in the bilges and must be periodically removed." Compl. ¶ 80. Additionally, the vessels "have anti-fouling hull coatings that leach, thus discharging pollution into the waterway adjacent to the [P]laintiff's property, and hence into the Elizabeth River. The [D]efendants' failure to properly

4

maintain the vessels results in paint peeling from the vessels and falling into the waterway." Compl. ¶ 83.

Plaintiff alleges that Defendants' actions cause it economic harm in the form of lost or reduced rents and reduction in the value of its property. It asks the Court "to order the defendants to remove the blockage they have placed in the navigation channel, clean up the eyesore they have created, and stop polluting the Elizabeth River." Compl. ¶ 4. Plaintiff also claims special damages. See Compl. ¶¶ 42, 53, 59, 66, 73, 82, 85.

**B. Procedural History**

Plaintiff filed the Complaint on May 22, 2015. Doc. 1. On August 4, 2015, Defendants filed this Motion to Dismiss. The parties entered a stipulation of dismissal as to Counts I and II, and Plaintiff responded to the rest of the Motion on August 25, 2015. Docs. 18, 19. Defendants replied to Plaintiff's response on August 31, 2015. Doc. 20. A hearing was held on this matter on October 29, 2015.

Defendants argue that the Court should dismiss the entire Complaint for failure to state a claim upon which relief can be granted. Specifically, Defendants argue that Count III should be dismissed because Plaintiff has failed to plead facts giving rise to a claim under the Resource Conservation and Recovery Act. Doc. 13 at 6. Defendants also assert that Counts IV–VII fail because they do not assert cognizable claims under the Clean Water Act. Doc. 13 at 10. Additionally, Defendants claim that Count VIII fails adequately to plead a nuisance claim. Doc. 13 at 16.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss tests the sufficiency of a complaint; it does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) ("In considering a motion to dismiss, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff") (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)). A complaint establishes facial plausibility "once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). Therefore, the complaint need not include "detailed factual allegations" as long as it pleads "sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." Id. Although a court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In deciding the motion, a court may consider the facts alleged on the face of the complaint as well as "'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (1990)). The court may look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004)

(citations omitted).

## III. ANALYSIS

### A. Count III

In Count III, Plaintiff claims that Defendants' unlicensed pier/storage facility violates the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA"), its implementing regulations, and the Virginia Waste Management Act, Va. Code § 10.1-1400 et seq. and its implementing regulations. Compl. at 22. The Virginia Solid and Hazardous Waste Management Law cited by Plaintiff was enacted pursuant to RCRA. See 3 Fed. Envir. Reg. of Real Estate § 8:280 (2015). Virginia Code Section 10.1-1408 requires a permit for the operation of any sanitary landfill or other facility for the disposal, treatment, or storage of nonhazardous solid waste. Va. Code § 10.1-1408(A). It also prohibits any person from owning, operating, or allowing to be operated on his property an open dump. Va. Code § 10.1-1408(H).

RCRA governs the treatment, storage, and disposal of solid and hazardous waste. See, e.g., Meghrig v. KFC Western, Inc., 516 U.S. 479, 483 (1996). Its primary purpose "is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Id. (quoting 42 U.S.C. § 6902(b)). RCRA contains two citizen-suit provisions which enable private parties to sue under certain circumstances. See 42 U.S.C. § 6972.

*i. 42 U.S.C. § 6972(a)(1)(A)*

Under 42 U.S.C. § 6972(a)(1)(A), a private party "may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to"

RCRA. In such an action, the plaintiff must allege that the defendant's violation of either a state or federal standard that became effective pursuant to RCRA is current and ongoing. See, e.g., Goldfarb v. Mayor and City Council of Baltimore, 791 F.3d 500, 504 (4th Cir. 2015). While the violation must be continuous or ongoing, however, the defendant's conduct causing the violation need not be ongoing. Id. at 513. Instead, "the proper inquiry centers on 'whether the defendant's actions – past or present – cause an ongoing violation of RCRA.'" Id. (quoting S. Rd. Assocs. v. IBM Corp., 216 F.3d 251, 255 (2d Cir. 2000)). Although the complaint in Goldfarb did specifically allege that the violations were "ongoing," the Fourth Circuit noted that "all the Complaint needed to do was provide sufficient detail about the claim to show that the plaintiff has a more-than-conceivable chance of success on the merits." Id. at 513.

In this case, Defendants argue that Plaintiff failed to allege specifically that the violations were "ongoing." However, there are enough facts in the Complaint, which, if taken as true, establish that Plaintiff has a more-than-conceivable chance of showing that Defendants' violations are ongoing, as required under 42 U.S.C. § 6972(a)(1)(A). In addition to stating that the unlicensed pier/storage facility violates RCRA, Plaintiff avers that Defendants "are operating a facility for disposal and/or storage of solid waste without a permit from the Virginia Department of Environmental Quality, in violation of Virginia Code section 10.1-1408.1(A), 9 VAC 20-81-40(a) through (C), and 9 VAC 20-81-400(A)," Compl. ¶ 48, that "[D]efendants' discharge of pollutants into the Elizabeth River from their unlicensed pier/storage facility is prohibited by 40 CFR section 257.3-3(a)," Compl. ¶ 50, and that the "[D]efendants are operating an Open Dump at their unlicensed pier/storage facility, in violation of Va. Code section 10.1-1408.1(H) and 9 VAC 20-81-45 (A)(1)," Compl. ¶ 51. These allegations are written in the

present tense, and paragraph forty-five includes the phrase "up to and including the present time," Compl. ¶ 45, which implies that the alleged violations have not ceased.

Defendants claim that Plaintiff alleges solely past violations. See Doc. 13 at 8 (citing Compl. at ¶ 49). While the Complaint details "180 dates in the last 5 years when a storm event at this location generated rainwater runoff from the many tons of solid waste in the [D]efendants' unlicensed solid waste management facility such that . . . pollutants were discharged into the waterway causing uncontrolled environmental damage," it does not allege solely past violations. Compl. ¶ 49. Rather, this paragraph explains that storms and rainwater runoff mixed with the solid waste cause "uncontrolled environmental damage." Compl. ¶ 49. Presumably, it will rain in the future, and when it does, it will cause environmental damage in violation of RCRA. The common-sense fact that rain in the future likely will cause the same type of violation and damage as did rain in the past allows the Court to infer more than the mere possibility of misconduct – specifically, that the violations are ongoing. Thus, accepting these allegations as true, Plaintiff's complaint is sufficient to state a plausible claim under 42 U.S.C. § 6972(a)(1)(A), and the Court **DENIED** the Motion as to this claim.

### ii. 42 U.S.C. § 6972(a)(1)(B)

Private plaintiffs in a RCRA action also can sue under 42 U.S.C. § 6972(a)(1)(B). Under this section, a plaintiff must show that a person, including any past or present generator, transporter, or owner or operator of a treatment, storage, or disposal facility, has contributed or "is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). A suit under this section, unlike one under § 6972(a)(1)(A), may be based on a past violation. See Goldfarb, 791 F.3d at 504. Here,

Defendants concede that the Complaint sufficiently alleges both that Defendants own and operate a storage facility that contains solid waste and that Defendants store solid waste at their facility. Doc. 13 at 7. Therefore, the only question is whether the Complaint sufficiently alleges that the waste in question may present an imminent and substantial endangerment to health or to the environment. Id.

Waste may present an imminent and substantial endangerment to health or to the environment if the danger of harm is immediate. See Meghrig, 516 U.S. at 485. While the threat of harm must be immediate, the threat's impact need not be felt until later, since the statute specifically considers waste that *may* present endangerment. Id. at 485–86 (citing Price v. United States Navy, 39 F.3d 1011, 1019 (9th Cir. 1994)). Therefore, an allegation of harm that no longer presents any danger – such as one negated by a defendant's remedial measures – could not constitute the basis for suit under § 6972(a)(1)(B). See Meghrig, 516 U.S. at 486. Additionally, the Complaint need not allege actual harm as long as it sufficiently asserts "a threatened or potential harm." Interfaith Community Organization v. Honeywell Intern., Inc., 399 F.3d 248, 258 (3d Cir. 2005) (citing Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1015 (11th Cir. 2004) (defining "endangerment")).

The statute addresses endangerments to both health and the environment, and a well-pled complaint need only allege a threated harm to health or to the environment to be sufficient. See, e.g., Interfaith, 399 F.3d at 263. The United States Court of Appeals for the Third Circuit and the United States District Court for the Eastern District of New York have noted that environmental endangerment constitutes danger to "water in and of itself." Id.; see also Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81, 115 (E.D.N.Y 2001). Additionally, a court may consider an environment's aesthetic value when considering whether a defendant's activities

threaten harm. See Aiello, 136 F. Supp. 2d at 117. In Aiello, the Eastern District of New York noted that if the defendant continued its activities, "Motts Pond and Motts Creek would forever remain visual blights. This is unacceptable," and it held that the defendant was liable under RCRA for the aesthetic damage to the pond. Id. at 117, 121.

Here, the Complaint does not specifically allege that Defendants' RCRA violations may present an imminent and substantial endangerment to health or the environment. The Court therefore **GRANTED** the Motion as to the claims under 42 U.S.C. § 6972(a)(1)(B) and **GRANTED** Plaintiff leave to amend the Complaint to allege that Defendants' RCRA violations may present an imminent and substantial endangerment to health or the environment.

**B. Counts IV, V, and VI**

In Counts IV–VI, Plaintiff alleges Clean Water Act ("CWA") violations at Defendants' unlicensed pier/storage facility (Count IV), at the Ex-USS YRST-2 (Count V), and at the BARGE ATC 12000 (Count VI). Compl. at 25–29. The CWA provides for citizen suits in 33 U.S.C. § 1365, and it aims "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Rapanos v. United States, 547 U.S. 715, 722–23 (2006) (quoting 33 U.S.C. § 1251(a)). Plaintiff bases its claims on 33 U.S.C. § 1311(a), which prohibits the discharge of pollutants, including dredged or fill material, from a point source into waters of the United States without a permit or other statutory authorization. See Rapanos, 547 U.S. at 723; see also United States v. Bedford, No. 2:07cv491, 2009 WL 1491224, at *9 (E.D. Va. May 22, 2009). The issue at this stage is whether the pier/storage facility and vessels named in Counts IV–VI constitute "fill material." In any case involving statutory interpretation, courts should begin with the statute's language. See Kentuckians for Commonwealth Inc. v. Rivenburgh, 317 F.3d 425, 441 (4th Cir. 2003).

The CWA does not define fill material, but the Code of Federal Regulations defines it as "material placed in waters of the United States where the material has the effect of (i) replacing any portion of a water of the United States with dry land; or (ii) changing the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(e)(1). Waste, trash, or garbage does not constitute fill material. 33 C.F.R. § 323.2(e)(3). The regulations list examples of fill material, which include "rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States." 33 C.F.R. §323.2(e)(2). This type of material "is typically deposited for the sole purpose of staying put." Rapanos, 547 U.S. at 744. The regulations define "discharge of fill material" as "the addition of fill material into waters of the United States," and examples include "placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands . . ." 33 C.F.R. §323.2(f).

Courts have interpreted activities such as depositing concrete, sand, dirt, and gravel into a waterway as well as creating a dam as discharging fill material in violation of the CWA. See Starr Indem. & Liability Co. v. Continental Cement Co., L.L.C., No. 4:11cv809, 2013 WL 1442456, at *18 (E.D. Mo. April 9, 2013); see also United States v. Brink, 795 F. Supp. 2d 565, 580 (S.D. Tex. 2011); see also Bedford, 2009 WL 1491224, at *10. In Bedford, for example, this Court noted that the defendants discharged fill material when they deposited forty-nine truckloads of sand and fill dirt, thirty truckloads of sand and gravel, and four truckloads of dirt into wetlands. 2009 WL 1491224, at *10. While courts have held that substances such as

concrete represent fill material, the United States District Court for the Eastern District of Missouri did not classify a sunken boat carrying concrete as fill material. See Starr Indem., 2013 WL 1442456, at *18 (classifying the concrete inside of the boat, but not the boat itself, as fill material); see also Brink, 795 F. Supp. 2d at 580. Thus, while concrete and similar materials by themselves may constitute fill material, structures that hold the material and infrastructure such as docks do not. See United States v. Lambert, 915 F. Supp. 797, 802–04 (S.D. W. Va. 1996) (classifying broken concrete, stone, and soil as fill material but classifying a dock as a structure).

Here, neither party asserts that an unlicensed pier/storage facility or a vessel replaces any portion of a waterway with dry land. Therefore, the issue is whether the pier/storage facility and vessels change the bottom elevation of the water. Plaintiff argues that because Defendants' unlicensed pier/storage facility and vessels are aground at almost all times, they change the bottom elevation of the waterway and thus represent fill material. Compl. ¶¶ 56, 62, 69. One presumably can infer from the Complaint that Defendants placed the unlicensed pier/storage facility and the vessels in the water with the purpose that they stay put there. The Complaint also states that the unlicensed pier/storage facility no longer constitutes a vessel, though once it was a barge. Compl. ¶ 14. Therefore, the Complaint alleges sufficient facts to state a claim upon which relief could be granted. Hence, the Court **DENIED** the Motion to Dismiss.

**C. Count VII**

In Count VII, Plaintiff alleges additional CWA violations stemming from Defendants' vessels, the ex-USS YRST-2, the BARGE ATC 12000, the ex-USS ZUNI, the F/V SHEARWATER, and the ATLAS CRANE BARGE. Compl. at 30–32. Plaintiff alleges that stormwater flowing off of the vessels during rain storms pollute the waterway, Compl. ¶ 76, that water enters the vessels' interiors and collects in the bilges, Compl. ¶ 80, and that the vessels'

paint peels into the water, thereby polluting it, Compl. ¶ 83. Plaintiff alleges that Defendants periodically pump the bilge water that accumulates in the vessels into the waterway. Compl. ¶ 80. Finally, Plaintiff alleges that Defendants lack permits to discharge this pollution into the waterway, in violation of 33 U.S.C. § 1311(a) and Va. Code § 62.1-44.5. Compl. ¶¶ 77, 81, 84.

The CWA "prohibits the discharge of any pollutant from a 'point source' into navigable waters without a permit." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 390 (4th Cir. 2011) (citing 33 U.S.C. §§ 1311(a), 1319(c)(2)(A), 1362(7), 1362(12), 1362(14)). The CWA defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The CWA does not define "nonpoint source," although the "statute clearly indicates that there is a category of nonpoint source pollution," the regulation of which it leaves to the states. See Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 219 (2d Cir. 2009). Most discharges composed entirely of stormwater constitute nonpoint source pollution and therefore do not require a permit; however, for those stormwater discharges that do stem from point sources, "Congress directed the EPA to continue to require permits for stormwater discharges associated with industrial activity." Decker v. Northwest Environmental Defense Center, 133 S.Ct. 1326, 1332 (2013); 33 U.S.C. § 1342(p). Therefore, when determining whether Defendants need a permit, the Court first must decide whether the stormwater was discharged from a point source. If it was not, then Defendants do not need a permit. See 33 U.S.C. § 1342(p)(1). If it was, however, then the Court must determine whether the stormwater discharges were exempt from

the permit requirement because they were not associated with industrial activity. See Decker, 133 S.Ct. at 1342 (Scalia, J., concurring and dissenting).

### i. Point Source Pollution

A vessel is listed as a type of point source. 33 U.S.C. § 1362(14). The classification of stormwater runoff as discharge from a point source or a nonpoint source, however, depends on whether the runoff is allow to run naturally or whether it is collected or channeled before being discharged. See, e.g., Cordiano, 575 F.3d at 221. In Cordiano, the United States Court of Appeals for the Second Circuit held that since lead deposited into a berm only flowed into wetlands as part of surface water runoff from rain or flooding, and because there was no evidence that the surface water runoff from the berm was collected or channeled, the berm did not constitute a point source. Id. at 224. Conversely, the United States Court of Appeals for the Ninth Circuit held that a stormwater drain system collected or channeled rainwater, so the owner of the system needed a permit under the CWA. Greater Yellowstone Coalition v. Lewis, 628 F.3d 1143, 1152–53 (9th Cir. 2010). It noted, however, that the seepage of some of the water through the cover and into a pit was "nonpoint source pollution because there [was] no confinement or containment of the water." Id. at 1153.

In the Complaint, Plaintiff alleges that "water that enters the interior of these vessels collects in the bilges and must be periodically removed." Compl. ¶ 80. Plaintiff sufficiently has alleged that the water "collects" in the vessels, which constitute point sources under 33 U.S.C. § 1362(14). Thus, this part of the Complaint sufficiently alleges that the stormwater runoff is point source pollution. Therefore, the Court must determine whether it falls within the industrial activity exemption. See Decker, 133 S.Ct. at 1342.

### ii. Associated with Industrial Activity

People are required to secure permits for the discharges of channeled stormwater runoff only if the discharges were associated with industrial activity. See Decker, 133 S.Ct. at 1336; 33 U.S.C. §1342(p)(2)(B). The CWA's implementing regulations define stormwater discharge associated with industrial activity as "the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14). The fact that it is alleged that Defendants are using the destroyed barge as an unlicensed pier/storage facility and the moored vessels are held for future use as a reef is sufficient to allege that the discharges are associated with industrial activity.

Therefore, Count VII adequately alleges a point source and industrial activity, so the Court **DENIED** the Motion as to Count VII.

**D. Count VIII**

In Count VIII, Plaintiff alleges that Defendants' actions are a nuisance. Specifically, it asserts that Defendants' "unauthorized obstructions of [the public] waterway" adjoining Plaintiff's property are a nuisance, Compl. ¶ 87, that "the access by water to and from [P]laintiff's property is substantially impaired by [D]efendants' unauthorized obstructions," Compl. ¶ 88, that Defendants' "uncontrolled releases of pollution into the waterway" are a nuisance, Compl. ¶ 89, and that Plaintiff has suffered special damage due to Defendants' actions, Compl. ¶ 90.

In Virginia, there are two recognized types of nuisance: public and private. See, e.g., City of Virginia Beach v. Murphy, 239 Va. 353, 355 (1990). The Complaint does not specify which type of nuisance is at issue here. Therefore, the Court **GRANTED** the Motion, giving Plaintiff **LEAVE TO AMEND** the Complaint.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTED** Defendants' Motion to Dismiss on Count VIII and on the 42 U.S.C. § 6972(a)(1)(B) claim of Count III, giving Plaintiff **LEAVE TO AMEND** those counts to conform to this Court's ruling. The Court **DENIED** the Motion as to Counts IV–VII and to the 42 U.S.C. § 6972(a)(1)(A) claim in Count III.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
October 29, 2015